Morning, your honors. May it please the court. I'm Steve Davidson here on behalf of Metropolitan Life. Dan Zollner and John Svoboda are at council table for four. We'll be dividing the area between us. I'll take the first ten minutes. Your honors, this is an erisic case in which the district court went well beyond its proper role when performing judicial review of a claim determination under the abuse of discretion standard, applying an incorrect definition of that standard, and reweighing the evidence as if it was making the decision on its own for the first time. That's not what ERISA calls for, and that's why we'll ask you to reverse this morning. I feel compelled to begin with what I think is the most obvious error in the district court's decision, which is its use of a sufficient evidence test in lieu of the proper substantial evidence test. And I saw that in the order and I thought, well, maybe there's just a typo, just got the word wrong. It's not semantics, and you could tell that from the content of the order. And I think because it really made a difference in how the district court approached the issues in its review on this case. And I think the best example is this five-question health screening form that Mr. Minara has completed. It's in the record. The human resource TPA for Ford found it, sent a copy to MetLife, said, here it is. This is the form. Here are the answers that Mr. Minara's gave to the questions. And MetLife said, great, accepted that as true, and made its claim decision on the basis of that information. District court disagreed and said, said things that suggested the imposition of a burden of proof upon MetLife, somehow independent of simply a review of the record that simply is not appropriate under ERISA. The district court's order said things like, MetLife has not shown that the decedent answered no to the questions. MetLife has not proved that Mr. Minara's answered health-related questions untruthfully. MetLife had no burden to prove authenticity of underlying documents in front of the district court at this stage. ERISA cases under the abuse of discretion standard of review simply is not a fact-finding exercise. And that's really what Judge Battalion did in his review of this case. It was error not just to use the wrong word. But it was error to impose a burden of proving something more than simply the proper standard of review, which is that the record contain more than a scintilla, but less than a preponderance of evidence, in support of the claim determination that MetLife made. And when the plans designee for processing this life insurance underwriting information tells MetLife, here's the questions, here are the answers, MetLife is entitled to rely upon that. And that is sufficient proof in the record to satisfy the substantial evidence test that the district court should have applied. The second, I think, big picture item I want to emphasize this morning, is that it's a completely appropriate exercise for a benefit plan like Ford, hiring an insurance company like MetLife, to choose to say that we're not going to allow employees to obtain optional life coverage, unless and until the proper medical information is received by, and then evaluated by, and then approved by the insurance, to establish that the employee is a suitable candidate for additional life insurance from a medical perspective. Remember, this plan has a basic life component and an optional life component. The basic life component is not underwritten. It's a relatively modest benefit. It's $50,000 that was paid to Mr. Monaro's spouse in this instance. But the structure of the plan allows the employee an opportunity for the employee's convenience to buy more insurance, just like going to an insurance agent and buying more insurance. So is there an additional premium to be paid for the optional life coverage? Yes, and it's paid by the employee, withdrawn from their paycheck. But to structure your plan such that that coverage can't be issued until you, employee, demonstrate to us that you're medically suitable for this coverage is an appropriate goal of an ERISA plan. Judge Battaglione, in his order, said, my understanding of the goal of this plan is to provide life insurance to people. Well, we would characterize it a little bit differently. Certainly, that's the goal of the basic life benefit. The optional life benefit's goal is to give the employees an opportunity to buy more coverage if and only if they can first establish medical eligibility for that coverage. Mr. Davidson, I understand you're suggesting that we send this case back for another trial with the proper burden used. Is that where you're coming from here? No, Your Honor. Your standard of review is de novo in terms of, you conduct your own evaluation as to whether the standard of review is satisfied. Our request is that you complete that review, apply the abuse of discretion standard in the proper way, and find that the claim determination was not an abuse of discretion, and complete that task yourself. It doesn't need to go back to Judge Battaglione again. Why don't you address, then, what is the substantial evidence in the record that you think supports the sufficient? I mean, sufficient evidence isn't a standard. It could be just a way of referring to the standard of substantial. If it's not substantial, it's not sufficient. So what's the substantial evidence? It begins with the no answers to the five health screening questions, one of which relating to high blood pressure simply was not true. Mr. Menara has had an extensive history of care and treatment for high blood pressure, including hospital visits where he thought he was having a heart attack, regular physician visits where he would run out of medication and would have to go back to his doctors and ask for more.  He was asked a series of screening questions in order to trigger a more comprehensive underwriting process. One of those questions was, do you have any history of high blood pressure, treatment for high blood pressure? He said no. Because he said no, that underwriting process never occurred. It was never triggered by the health screening questions. And without it, MetLife was unable to evaluate in the first instance whether this candidate for optional life insurance was medically qualified to receive it or not. And the way the plan is structured, coverage never exists. It's never issued in the first place unless and until that medical underwriting process takes place. Regardless of the outcome of it. The district court seemed to then go on and question what would have happened hypothetically. Sure. Is there any materiality requirement in these answers? There is not under the structure of this plan. And the record is clear that the MetLife underwriter said, from what I have in front of me, I can't tell if we would have issued coverage or not. But the way the plan was set up is to require that the underwriting process itself occur as the prerequisite to the issuance of coverage. Not that the outcome go one way or another. And it's because of this multiple step process in enrollment. It starts with the screening questions. And the screening questions are what triggers the more comprehensive medical evaluation. So when an employee says no to everything, the coverage issues, MetLife's underwriting group never does anything, and the coverage goes in place. But when you get the yes answer, that's what causes MetLife to require a statement of health, potentially review of medical records, potentially have the person examined, so that it's not taking an unreasonable risk in issuing coverage in the first instance. But suppose they find out later one of the answers was wrong. Do they reconstruct what would have happened and say, this wouldn't have made any difference? That's not what happens under the structure of this plan because, as I said, once they find it. They automatically cancel any policy when they find what was right. When they find that underwriting should have happened and didn't, that's the event that causes the coverage to never go into place in the first instance. Is that in the record? It is. Where would we find that? It's the way in which the plan language is set forth, particularly. No, I'm talking about the practice of the company. Is it established that they automatically cancel whenever there's an incorrect answer to one of the five screening questions? Or is the record that, no, sometimes they leave the policy in place if they decide that it was immaterial? I don't know that this record goes into deeply into what happens broadly like that. There's some e-mails where it's suggested that every time there's a no question, the policies are issued. But when there's a yes answer to the screening questions, that's what triggers the additional underwriting process. Right. No, I understand that. Beyond that, I don't think the record speaks to the question. About what happens when the company finds out later that there's a wrong answer. We know what, in this case, what the decision letter said was, we didn't get to underwrite your file, so your coverage never came to be. Right. Go ahead. Judge Shepard might have a question. Just a quick one. When the decision was made to deny the claim, was there any provision made for refund of premiums? Yes. The initial letter said, we will refund your premiums when your appeals are complete. And as we sit here today, obviously, the answer to coverage is still unknown. MetLife will refund the $71, in some sense, in premium if and when it's determined that it's not obligated to pay this claim. Very well. Thank you for your argument. Mr. Zollner, we'll hear from you. Good morning. May it please the court? Wait a minute. I think he had five minutes. We might have gone over time with Mr. Davidson, but let's give him his full five, please. Thank you, sir. Daniel Zollner on behalf of Ford. This is a fully insured plan. Ford was the plan sponsor and the plan administrator. MetLife was the claim administrator and the insurer. In this instance, Ford delegated to MetLife the underwriting of the program, the claim determination, and the claim payment. I'd like to address the counts three through five, the breach of fiduciary duty 502A3 claims. As soon as the district court determined that Ms. Sepulveda Rodriguez had a viable claim for benefits under 502A1B, then she should not have been permitted to seek summary judgment or even get judgment on the A3 claims for equitable relief. Those should have been immediately dismissed. It's Hornbook law that you cannot both pursue an equitable claim under A3 and a benefits claim under A1B. In this instance, the district court first found that there were benefits due and payable under A1B, and then addressed the A3 equitable claims, and that should not have been done. They should have been dismissed. And without the A3 claims, there shouldn't have been any basis for imposition of attorney's fees against Ford. What about the penalty? No, go ahead. Well, there's the separate issue of the penalties, right? Yes, sir. The penalty under 502C. We do not believe that that should have been imposed, that it was an abuse of discretion to impose penalties in this situation. The record was undisputed that it was an inadvertent error. The employee who received the first letter requesting the summary plan description quit Ford's employment. The letter was- Does the statute forbid penalties in the case of negligence by the defendant? No, sir, it does not. So inadvertence isn't really a basis to say there's- Inadvertence is not a defense. I agree with that, Your Honor. So what's the abuse of discretion here then? Well, once the court undertook to review and exercise its discretion, we believe that the discretion should have been exercised properly. And in this case, the court found that Ford's mistake was inexcusable, but then later found that Ford did not act maliciously or intentionally or in bad faith. So we believe that the record establishes that the mistake was inadvertent. We didn't act intentionally or maliciously to harm the plaintiff. It fell through the cracks. And as soon as we found out that it fell through the cracks, we immediately sent the letter. And we called the attorney and said, we're sending the letter. And the letter sent the summary plan description. And the attorney received the summary plan description before he filed suit saying he didn't get it. He had it for at least two weeks before he sued us under 502C saying the court should order us to send it. And how should this direct us? I mean, where should this lead us in deciding what are you arguing that we need to do to rectify these problems that you've just outlined? We believe that the sanctions should be removed. That Ford should not have been sanctioned for a 19 day delay in providing the summary plan description, especially in a situation where it did not cause any prejudice to the participant beneficiary. In this instance, the appeal was handled by MetLife. You seem to be saying we should state a rule that if the failure was inadvertent and caused no prejudice, then it's an abuse of discretion to impose the penalty. Would that be the opinion you want us to write? That's the argument that we're making. But doesn't that conflict with our cases is my concern. We have this Starr case that seems to say good faith and absence of harm do not preclude the imposition of penalty. So how could we write the opinion that says the opposite? Because the Starr case also says that the court should primarily look at whether or not the defendant acted intentionally, maliciously, or in bad faith, and whether there was prejudice to the plaintiff. And in this case, she had the summary plan description well before she filed suit. She didn't go back and try and reopen the administrative record to have it redetermined. Her attorney waited three months after filing suit to bring the benefits claim. There's nothing that Ford's 19 day delay did to prevent her from seeking benefits in this case. How much were the penalties? Originally $20,000 reduced to $2,000, which was the maximum. $2,000 penalty against Ford? Yes, sir. All right. Well, thank you for your argument. Let's see. Mr. Monahan, we'll hear from you. Thank you, Your Honor. I'm pleased to court. I'm Tom Monahan. I represent the plaintiff in this matter. Let me start with Ford. There was prejudice. The lawyer who made the applications to Ford ended up getting fired because he couldn't get the documents that he needed from Ford. He spent a lot of time asking MetLife for it. I think there are at least five letters that you can find in the record if you look at the record. It cost my client a great deal of attorney's fees, actually more than what the penalty would be from Ford Motor Company. The court did find that there was- Well, if he asked the wrong place, why would that be Ford's fault? I didn't say it was. If it was Ford's fault, then the penalty would have been much higher because the period of time would have been longer. I'm not saying that Ford ought to pay more. I'm saying that Ford ought to pay what the statute requires. That's all I'm saying. When it comes to prejudice, what was the prejudice of the 19 days? When we first get the case, we don't have it because it's with the other lawyer. We finally get it. We believe that there was a period of time that we had to file the lawsuit and get going. One, it was difficult to determine which meant life to sue, what role Ford actually did play. Was Ford just an independent player that employed our client's husband, or were they actively involved in it? As you can see from the initial complaint, we had it wrong. We had to do an amended complaint. There was some effort that we had to go through. Besides, the statute is pretty clear. It doesn't say there has to be malice or anything else. The court did find that there was some prejudice to us in that we didn't receive it on time. Can I now shift? Are there more questions on this? No, not for me. I think maybe you should address the claim against met life. Thank you. We believe that the court applied the law appropriately. The courts give great deference in these types of cases to the employer. I think that Judge Bajayan did give great deference, but when he started looking at the record, and they went through the record very carefully, it was very confusing, and it was contradictory. There are all sorts of statements within the record indicating that. We're not sure whether the five questions, one, were required. Two, were they answered? Do we know exactly what the questions were? Do we know what the answers were? Do we know whether it's the same as the paper version, or is it the computer version? I don't believe that they ever really figured that out. Certainly, they found against the issuance of the insurance. Then there were the number of questions. All right, let's assume he did answer them wrong. Would they still have granted the insurance? There's a great deal of conversation. If you go through Judge Bajayan's opinion, he sets it all out as to the confusion of what was going on. The statements were, well, we don't know. We don't think that, one, that the plan requires this type of questions. Or the statement of the insurance requires it. It was confusing back and forth. But in the end, the company said the plan does require the five questions, and we have received what we believe are answers that the man gave, one of which was not true. That's right. The company did make a decision. So why isn't that something that passes muster under an abuse of discretion substantial evidence standard? I think the standard is the court will give a great deal of deference to the decisions made unless it's absolutely wrong. In this instance, it was wrong, and the court found that it was wrong. I believe that they made the decision to deny insurance before they even knew whether he had completely answered the questions, whether that had been resolved. Certainly it hadn't been resolved whether or not they would in fact have insured him. The third issue is that they had yearly updates. Ford had yearly updates, and Ford even filed an affidavit. In one of the briefs on summary judgment, saying that, well, that has nothing to do with it, and Ford wouldn't have or MetLife wouldn't have any information regarding this instance because it wouldn't have applied, except it was in the record. MetLife did have it. It was there. And it showed that his conditions in the two subsequent years of medical exams would have shown that his answers of no, if he answered it no, was in fact accurate. That's what Judge Battalion was faced with, was if you simply gave them absolute deference, which I don't believe the court has the right or obligation to do so, but if you did that, then you'd fine for a metropolitan. But that's not the court's job. The court's job in this instance was to take a look at it and see if it did pass muster. And Judge Battalion sets forth very clearly in his opinion that it doesn't. And this court has a right to look at what Judge Battalion did de novo. I would encourage you to do that. I would encourage you to read the record. And if we find that he applied the wrong standard, then what do we do with it? It's not going to take you long to beat him, but I don't think you'll find that. I think you'll find that his opinion was thoughtful and wise. He also came up with if you don't, then you have the equitable rights under our claim. I don't have as much faith in those. Equitable rights to fashion a result of some kind with all these problems that both sides have set forth? That's correct. Again, I don't have as much faith in that, and I'm not arguing that. What I'm saying is that what Judge Battalion did is what the district courts are obligated to do, which is to give great deference to the employer. But if the employer has it wrong, and if you read the back and forth between the underwriters and the business folks, and remember there is the issue of a conflict of interest when a company like MetLife does both, makes the determination and pays the money out. There is that inherent conflict of interest. But nevertheless, all you have to do is read back and forth between all these people. They didn't know what was going on, and they nevertheless found a way to say, no, we're not going to give him insurance. We're not going to grant it, and we're going to pay it back when this case is over. I would say that if you spend the time and look at Judge Battalion's decision, there is no way that you can reverse it. When you say you don't have much faith in the equitable claims, you're not arguing it. Mr. Ford, that was discussed here briefly. You're focused only on the claim against MetLife. I'm focused on the claim against MetLife. Ford owes the $2,000. The penalties, but the other claims against Ford, do you agree those? If we could have figured out a way to get Ford out of this case without completely getting him out and causing problems for the court and the decision, we might have done that. I'm just trying to nail down whether you are defending a judgment against Ford other than on the penalties. No. All right. Is there anything else you want to say about the MetLife claim, or have you covered it? As I say, if you look at the statements that the court had, and he sets them out verbatim from the record, you'll see that this case was decided properly. What about this point that it's improper to speculate about hypothetically what the company would have done if he'd answered the questions truthfully? Well, that's what they were doing. The company was making those decisions, and they're saying that if you answer them wrong, well, they don't know really whether they're answering them wrong because they look at the records from before where they say, well, of course he had high blood pressure or he had heart pains or all of that. Well, those were related to other instances. They went away. There was explanation for it. This is by the underwriters themselves saying that. And then there were a number of records that provided indication that there was no coronary problems. There were no high blood pressure problems for the years afterwards. So the question is, which records are you going to take? The other thing is they had my client sign a release. They went back years on records that would normally not be a part of it, but it's still after all of that the underwriters said, you know, even if he had answered yes to all of these questions, we'd have still probably given him insurance. So there wasn't any loss to anyone or any damage to anyone. And that's what you look at. You say you have an underwriter in the record admitting that if the plaintiff had said yes to all the questions, they would have given him insurance anyway? If my records are . . . if I could get it. I mean, the company says that's contrary to their policy, which says you have to go through underwriting. One from Kay Fleming. What page are you reading from? I'm reading from page fourteen of Judge Battalion's opinion. Oh, I thought you were reading from the record. Well, it is from the record. All right. He's quoting the record, you mean? He's quoting the record. Yeah. It said they would not request additional documentation unless the employee had hypertension and hyperpedia and was being treated by a cardiologist and being medicated. They also say that upon the medical records, the employee should have stated he had chest pains. The question does not even appear to ask about chest pains. However, the question for have you ever been diagnosed or treated by a physical sick for other health care provider does not show the drop downs. Only the next question, which is diagnosed, treated, or given. Is there more to this form where the first question is question mark? Plainmaster asks whether we ask about chest pains, but this form doesn't show that question. The planmaster doesn't state that we have to ask about hypertension, but their questionnaire does. So this is not a complete answer to all of this. You need to read Judge Battalion's decision where he weaves it all together using exactly the words from the underwriters and the directors. As I say, he gave deference to the court, as he should have, but found that there was not a scintilla of evidence and found in favor of the plaintiff on this. And we believe it's a legitimate decision. All right. Well, we have the substantial record, and we're in a position to review it. So thank you for your argument. Thank you. Mr. Davidson, I think you used all of your time. We'll give you one minute if you have something you're dying to say in rebuttal. Something that would be constructive. Let me put it that way. Something that would be constructive. Very briefly, the claim shows you a process of MetLife figuring out what happened, and it was uncertain for a while, but at the end of the day, they figured out what the questions were and what the answer was, and we're entitled to rely upon that in deciding the claim. That's number one. Number two. And that result, if that's true, the result would be what, in your view? The result would be that this court would find that the claim determination was not an abuse of discretion and dismiss the case. And so there would be no recovery by the plaintiff? No recovery by the plaintiff on the benefit claim or for attorney fees. Forward issues are distinct. Thank you. Very well. Thank you for your argument. The case is submitted, and the court will file an opinion in due course. Please call the next case for argument. 18-1574, 18-1647, and 18-2116 from the District of Nebraska, Philip Patron et al. v. Werner Enterprises et al.